**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Daniel W. ROBINSON, Dillard E. Woods, and Paul E. Robinson, Defendants–Appellants.**

**Nos. 89–3680, 89–3687 and 89–3726.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1990.

Decided Feb. 27, 1992.

Rehearing and Rehearing En Banc Denied April 24, 1992.

Clifford J. Proud, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Crim. Div., Fairview Heights, Ill., for plaintiff-appellee.

Burton H. Shostak (argued), D.J. Kerns, Moline, Ottsen, Mauzé, Leggat & Shostak, St. Louis, Mo., Richard H. Sindel (argued), Daniel L. Seiden, Sindel & Sindel, Clayton, Mo., and Robert W. Ritchie (argued) and David M. Eldridge, Ritchie, Fels & Dillard, Knoxville, Tenn., for defendants-appellants.

Before COFFEY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

KANNE, Circuit Judge.

On May 17, 1989, Daniel W. Robinson, Paul E. Robinson, and Dillard E. Woods were charged in a four count superseding indictment with conspiracy to distribute and possession with the intent to distribute large quantities of cocaine. Count 1 charged that, from 1980 until May 1988, the appellants, together with Edward E. Alvarez and Serafin Hernandez, conspired to distribute and possessed with the intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and § 846.[1] Count 2 charged that Paul and Daniel Robinson and others, on or about March 14, 1988, possessed with intent to distribute five kilograms or more of cocaine in violation of § 841(a)(1) and 18 U.S.C. § 2. Count 3 charged that the appellants, on or about April 12, 1988, possessed with intent to distribute 500 grams or more of cocaine in violation of § 841(a)(1) and 18 U.S.C. § 2. Count 4 charged that on or about March 13–14, 1988, Paul and Daniel Robinson aided and abetted or caused interstate travel to facilitate the unlawful activity in violation of

§§ 841(a)(1) and 846, and 18 U.S.C. §§ 1952 and 2.

On June 21, 1989, a jury found Paul and Daniel Robinson guilty on all counts and found Dillard Woods guilty on counts 1 and 3. Pursuant to the Sentencing Guidelines, the district court sentenced Paul to a total of 360 months imprisonment and Daniel to a total of 288 months imprisonment.[2] Woods received 121 months imprisonment. On appeal, the appellants challenge their convictions on numerous grounds. In the alternative, Paul argues that the district court incorrectly applied the Sentencing Guidelines in sentencing him. We affirm.

I.

In 1972, Paul, with others, was smuggling marijuana from Florida to the St. Louis, Missouri–Southern Illinois area. The operation was not successful until 1974. During the early 1970's, George Yager, who testified for the government at trial, made numerous trips between Florida and St. Louis. Yager transported 200 pound shipments of marijuana to St. Louis and returned to Florida with the proceeds from the sale of those shipments. Another witness for the government, Richard Yackey, also drove shipments from Florida to St. Louis for Paul. Daniel managed the distribution of the marijuana in the St. Louis area, and reported to his brother Paul, who was in charge of the entire operation.

In the late 1970's, the Robinson organization expanded its activities. In 1977, Yackey was sent by Paul to Colombia to purchase 20,000 pounds of marijuana. In 1979, however, the marijuana distribution operation ended because the organization suffered several financial setbacks, including the loss of a large boatload of marijuana.[3]

---

1. Alvarez and Hernandez were fugitives from justice at the time of trial, but have since been apprehended.

2. Both Paul and Daniel Robinson's sentences on counts 2, 3, and 4 are to be served concurrently with their sentences on count 1.

3. The appellants were not charged in the indictment for any of their actions before 1980. The government introduced evidence of the 1972 to 1979 marijuana conspiracy under Rule 404(b) of the Federal Rules of Evidence to show "intent, preparation, plan and knowledge."

In 1978, Paul was convicted of four state felony narcotic offenses in Broward County, Florida and received a twenty-year term of imprisonment. This sentence was later reduced to fifteen years imprisonment on appeal.

In late 1979, before he began serving his Florida sentence, Paul contacted Yackey in St. Louis and asked Yackey to help him begin distributing cocaine. Paul wanted to begin selling cocaine to obtain income for his family while he was incarcerated in the Florida penitentiary system. Paul knew that Yackey's contact in St. Louis, Edward Murphy, was willing to purchase cocaine on a regular basis. In the fall of 1979, Murphy came to Florida to purchase a pound of cocaine with Yackey, which had been procured by Paul.

After the sale to Murphy was completed, Yackey explained the operation to Daniel. They decided that Yackey would contact Alvarez to determine if he would supply cocaine directly to the Robinson organization on a regular basis. The organization would in turn deliver the cocaine to Murphy. Alvarez agreed. After that, Murphy made regular "runs" to Florida to obtain multi-kilogram quantities of cocaine from Alvarez and bring it to St. Louis. Under the arrangement he reached with Yackey, Murphy received 50% of the profits, while the Robinsons and Yackey received the remainder. Murphy was also entirely responsible for financing the operation.

Woods assisted Murphy in "breaking down" the cocaine for sale and would also "stash" cocaine at his apartment in St. Louis. On occasion, Woods would deliver cocaine to Daniel's customers.

After several successful shipments of cocaine to the St. Louis area, Daniel told Yackey to inform Paul of the group's operations. After Yackey informed Paul of the group's activities, Paul and Daniel agreed that Yackey could retain 40 to 50% of their share of the organization's profits and that the Robinsons would receive the remainder.

In June 1981, Paul began serving his Florida sentence, which he completed in June 1985. While Paul was incarcerated, Daniel received Paul's share of the pro-

ceeds of the cocaine smuggling operation. From 1979 until 1984, approximately 110 kilograms of cocaine were purchased from Alvarez and other sources and brought to the St. Louis area for distribution.

In 1984, the Robinson organization distributed significantly less cocaine than in prior years. In January, Alvarez brought up a load of 15 kilograms, which was sold. Shortly thereafter, Yackey distributed the profits to Daniel (which included Paul's share) and to himself. Murphy then departed and the organization ceased operations for a short time. Yackey stated at trial: "[b]asically it was disbanded, we did nothing anymore. That was the end of it between all of us."

In late 1984, Daniel told Yackey that he was broke and wanted to start dealing cocaine again. Yackey, whose finances were in a similar condition, agreed to join him. Yackey then borrowed money from Murphy and began arranging shipments from Alvarez to the St. Louis area. Daniel told Yackey that he and Yackey would split the profits evenly.

Yager, who was then working at Yackey's restaurant, became the organization's principal runner. He often went to Miami, Florida to receive cocaine shipments from Alvarez and deliver the cocaine to the St. Louis area where it was stored by Woods. Yackey, Daniel, and Yager each had customers who would buy the group's cocaine for resale.

In 1985, Yager was told by Daniel that Yager, Daniel, Paul and Yackey were partners in the cocaine business. During that period, the organization first paid Yager in cash, but eventually paid him in cocaine, while it paid Woods in cash.

In June 1985, Paul was released from the Florida penitentiary system and moved back to St. Louis. Once there, he met with Yackey and demanded his one-third share of all the money made by the organization since late 1984, because, he argued, he had established the supply connection with Alvarez in the 1970's. Yackey then received instructions from Daniel to give Paul a one-third share of all profits which the orga-

nization received after it continued operations in late 1984, and to readjust the organization's books accordingly.

The Robinson organization continued to ship cocaine from Florida to St. Louis from 1985 until April 1988, when Paul and Woods were arrested. Between 1984 and 1988, 100 to 105 kilograms of cocaine were obtained from Alvarez and successfully distributed in the St. Louis area, with the exception of 30.9 kilograms which were seized by Drug Enforcement Administration ("DEA") agents during the investigation of the appellants.

In early 1988, the activities of the Robinson organization became known to drug enforcement agents. In March, Yackey travelled to Florida to meet with Alvarez to arrange the purchase of ten kilograms of cocaine. Yager joined Yackey in Florida with the money for the purchase, which he had received from Daniel. Yackey exchanged funds for five of the ten kilograms purchased with Alvarez, and Yager travelled back to St. Louis with five kilograms of cocaine.

Upon his return to St. Louis, Yager took the five kilograms of cocaine to a storage locker he had secured in Granite City, Illinois. When he arrived at the storage facility, on March 14, 1988, Yager was arrested by drug enforcement agents. After his arrest Yager agreed to cooperate with the government.

On that day, the drug enforcement agents also executed search warrants on the storage space and on a rental vehicle that Yager had parked near the locker. In addition to the five kilograms of cocaine found in the vehicle, the agents also found .25 of a kilogram in the locker. The .25 kilogram quantity was a portion of a fifteen kilogram shipment from Alvarez to St. Louis, in January 1987, that had been given to Yager to sell on consignment.

A few days later, after Yackey had also returned from Florida to the St. Louis area, Yager arranged to meet with him to give him the five kilograms of cocaine. After Yackey's arrival on March 18, 1988, he was arrested by drug enforcement agents. The agents also seized a handwritten drug ledger from Yackey. Later that day, Yackey agreed to cooperate with the government.

On March 23, 1988, drug enforcement agents requested that Yackey contact Alvarez to set up a purchase of twenty kilograms of cocaine. Yackey contacted Alvarez on several occasions to discuss this transaction. At the request of the drug enforcement agents, who were concerned that the undercover operation might be discovered, Yackey informed Alvarez that the deal would not directly involve either of the Robinsons.

Yackey, at the request of the agents, also placed a camera in his office at his restaurant. On March 31, 1988, Daniel visited Yackey at his restaurant. Daniel would not talk to Yackey, but instead relied on written messages to inform him "not to talk." Daniel then took Yackey to a lawyer's office in downtown St. Louis, where he determined that Yackey was not wearing a wire. They then returned to Yackey's restaurant where Yackey gave Daniel $4,000 and told him that $2,000 was for him and $2,000 was for Paul.

On April 2, 1988, Paul met with Yackey at a park in St. Louis County. He informed Yackey that he and Daniel had been arguing about how much money that he was spending. Paul told Yackey that Alvarez was "his connection" and that he wanted to split up with his brother Daniel and run the operation himself.

Yackey travelled to Florida on April 8 to complete the purchase of twenty kilograms from Alvarez that he had arranged shortly after his arrest. After the transaction was completed, Alvarez and Hernandez were arrested.

Paul met with Yackey at his restaurant on April 12, and told him to "come clean" if he had been "busted." Paul told him that "we need to know" because "we can say you were forced to cooperate."

On April 13, 1988, in Granite City, drug enforcement agents executed a search warrant at Woods' residence. The agents seized fifteen ounces of cocaine and took Woods into custody. The Robinsons were arrested shortly thereafter.

## II.

The appellants argue that the district court erred in denying their motions for a judgment of acquittal at the close of the government's case because the government proved that they engaged in several conspiracies, not the single ongoing conspiracy alleged in count 1 of the indictment. They contend that this variance from the indictment was prejudicial and requires us to reverse their convictions. *See United States v. Napue,* 834 F.2d 1311, 1333 (7th Cir.1987) (if there was a variance between the indictment and the proof, the defendant must demonstrate that it "had a substantial and injurious effect on the case's outcome"). We find that there was no variance.

"Whether there is one conspiracy or many is a question of fact for the jury's determination." *United States v. Molt,* 772 F.2d 366, 369 (7th Cir.1985), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 715 (1986). *See also United States v. Tarantino,* 846 F.2d 1384, 1391 (D.C.Cir.), *cert. denied,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988) (holding that a "verdict must be upheld if the evidence adequately supports a finding that a single conspiracy existed."). In *Napue,* we stated that "[s]eparate conspiracies exist when each of the conspirators' agreements has its own end, and each transaction constitutes an end in itself." 834 F.2d at 1332. A single conspiracy exists when "the agreements between the conspirators represent stages or different functions to be performed in the formulation of a larger scheme, the object of which is to effectuate a single unlawful result." *Id.* "A single conspiracy cannot be found, however, when there is no overall goal or common purpose." *United States v. Percival,* 756 F.2d 600, 607 (7th Cir.1985).

 The appellants argue that the evidence proves that there were three separate conspiracies, which occurred between 1980 and 1988. They claim that the first cocaine conspiracy began in 1980 and ended in 1984. To show that the conspiracy end-

ed, the appellants point to Yackey's statement at trial that: "[b]asically it was disbanded. We did nothing anymore. That was the end of it between all of us." The appellants assert that the second cocaine distribution conspiracy began in late 1984 or early 1985 and operated with virtually identical personnel until March 1988, when Yackey and Yager were arrested and began cooperating with the government. They further contend that the third conspiracy began in March 1988 and ended in May 1988, when the twenty kilogram transaction between Yackey, Alvarez and Hernandez was completed. Accordingly, they argue that Paul, Daniel and Woods were not members of this conspiracy because they were not involved in the transaction.

The evidence was more than adequate for the jury to find that there was a single conspiracy to distribute cocaine from 1980 to 1988. The appellants, together with Yackey and Yager, shared a common purpose to distribute large quantities of cocaine in St. Louis and Southern Illinois. The Robinson organization consistently utilized Alvarez as its source for cocaine throughout the 1980's, and used Murphy to supervise the distribution of the cocaine in the St. Louis area. Moreover, throughout the 1980's, Yager and Yackey transported the cocaine shipments from Florida to St. Louis.

We reject the appellants' argument that Yackey's statement that the cocaine distribution conspiracy was disbanded in 1984 proved that there were at least two conspiracies. Other evidence introduced by the government tended to show only that there was a brief lull in their cocaine distribution during the early months of 1984. *See United States v. Mealy,* 851 F.2d 890, 897 (7th Cir.1988) (the fact that the defendant was not continuously involved with the other conspirators did not negate a finding of a single conspiracy). Between 1984 and 1985, the appellants' participation in the drug transactions remained largely unchanged. *See United States v. Balistrieri,* 779 F.2d 1191, 1213 (7th Cir.1985), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986) ("[c]ontinuity of a con-

spiracy does not require perfect continuity of membership."); *United States v. Stern,* 858 F.2d 1241, 1249 (7th Cir.1988). The appellants and the other conspirators clearly sought to achieve the same purpose, namely to distribute large amounts of cocaine, from 1985 to 1988 as they had from 1980 to 1984. *See Percival,* 756 F.2d at 607 (to find a single conspiracy the government must show that there was an "overall goal or common purpose").

■ We also reject the appellants' argument that the arrest of Yackey and Yager terminated the conspiracy. The arrest of a member of a conspiracy does not necessarily terminate the conspiracy as a matter of law, because "the remaining conspirators may continue to carry out the goals of the conspiracy notwithstanding the arrest of one of their partners." *Mealy,* 851 F.2d at 901; *United States v. Papia,* 560 F.2d 827, 835 (7th Cir.1977). Alvarez continued to carry out the goals of the conspiracy after the arrest of Yager and Yackey. There is no evidence that any of the appellants attempted to withdraw from the conspiracy after the arrest of Yackey and Yager. *United States v. Andrus,* 775 F.2d 825, 850 (7th Cir.1985). The evidence was sufficient for the jury to find that the appellants were members of one cocaine distribution conspiracy.

A related issue is whether the district court properly admitted into evidence, pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, statements by Alvarez to Yackey regarding the May 1988 twenty kilogram sale. The appellants argue that because the Robinsons and Woods were not involved in that transaction, the testimony was improperly admitted into evidence. They are incorrect.

■ Statements by a co-conspirator may be introduced against other conspirators if the government shows that: (1) a conspiracy existed; (2) the defendant and declarant were members thereof; and (3) the offered statement was made during the course of and in furtherance of the conspiracy. *United States v. Hooks,* 848 F.2d 785, 794 (7th Cir.1988); *United States v. Kaden,* 819 F.2d 813, 818 (7th Cir.1987); *see*

*also Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). We review a district court's findings with respect to these elements for clear error. *Hooks,* 848 F.2d at 794; *Kaden,* 819 F.2d at 819.

■ We have already concluded that a conspiracy existed, and that the arrest of Yager and Yackey did not terminate it, satisfying the first requirement. The second requirement—that the defendant and the declarant were members of the conspiracy—is also satisfied. The third requirement—that the offered statement was made during the course of and in furtherance of the conspiracy—was clearly satisfied. Alvarez's statements to Yackey regarding the sale of twenty kilograms of cocaine included discussions of the price, payment terms, and arranging delivery. These statements were in furtherance of the conspiracy. The fact that one party to the conversation, Yackey, was acting at the request of government agents does not bar admission of a conspirator's statements under Rule 801(d)(2)(E). *Mealy,* 851 F.2d at 901; *United States v. Hamilton,* 689 F.2d 1262, 1269 (6th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983).

■ Equally meritless is the appellants' argument that the district court's instructions amended the indictment. Counts 2 and 3 of the indictment charged the appellants (count 2 excluded Woods) with possession of cocaine on different occasions with the intent to distribute, in violation of § 841(a)(1) and 18 U.S.C. § 2. The district court added the words "or aided and abetted another" to the jury instructions relevant to those counts. The appellants argue that the district court thereby amended the indictment. Aiding and abetting need not be alleged in an indictment. *United States v. Galiffa,* 734 F.2d 306, 312 (7th Cir.1984) (the district court can give an aiding and abetting instruction based upon the evidence if no unfair surprise results). If 18 U.S.C. § 2 is charged in the indictment, the defendant is put on notice that he can be convicted as an aider and abettor. *Id.* Because a violation of 18 U.S.C. § 2

was charged in the indictment, the appellants can neither claim an amendment of the indictment nor unfair surprise.

Paul and Daniel also contest the district court's decision to allow the government to introduce tape and video recordings of conversations between themselves and Yackey, and its decision to allow the jury to read transcripts of those conversations, which were prepared by the government, as the tapes played.

After listening to all of the tapes, with and without transcripts, the district court found that the tapes were sufficiently audible and trustworthy to be admissible. The district court agreed with the appellants that certain portions of the tapes were inadmissible. The court also held that a transcript of the taped conversations could be supplied to the jury for its use. The appellants and the government were unable to agree on a single transcript, and the appellants decided not to give the jurors their version of the transcripts. The district court found that the government's transcripts were sufficiently accurate to warrant their submission as an aid to the jury.

■ The appellants next argue that the district court abused its discretion in determining that the tapes were sufficiently audible and trustworthy to be admissible. " '[T]ape recordings which are only partially unintelligible are admissible unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy.' " *United States v. Zambrana*, 864 F.2d 494, 498 (7th Cir.1988) (quoting *United States v. Wilson*, 578 F.2d 67, 69 (5th Cir. (1978)). Our review of the tapes indicates that the tapes were generally audible, with inaudible portions. The inaudibility of a portion of a tape, which is generally audible, is relevant only to its weight, a jury question, not to its admissibility. *United States v. Vega*, 860 F.2d 779, 790–91 (7th Cir.1988).

■ The appellants also contend that the district court abused its discretion in allowing the jury to read government transcripts of the conversations as the taped conversations played. It is well settled that the district court has broad discretion "in deciding whether to allow the jury to use written transcripts as aids in listening to tape recordings." *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985); *Zambrana*, 864 F.2d at 497. The district court followed the procedures we set forth in *Zambrana* in ordering the parties to prepare a stipulated transcript or to produce alternate versions of the conversations. *See id.* at 498. The appellants declined to prepare their own version of the conversations. After reviewing the tapes and the transcripts, we conclude that the district court did not abuse its discretion in determining that the government transcript was sufficiently accurate to allow its use by the jury.

Paul and Daniel next contend that the district court erred in applying Rule 404(b) when it admitted evidence that Paul and Daniel engaged in a marijuana conspiracy in the 1970's. Woods argues that the evidence of the Robinsons' marijuana conspiracy prejudiced him. After considering the evidence and the appellants' objections, the district court admitted the evidence to show the Robinsons' "intent, preparation, plan, and knowledge."

■ We review a district court's decision to admit evidence of a defendant's prior crimes for an abuse of discretion. *United States v. Chaimson*, 760 F.2d 798, 808 (7th Cir.1985). In determining whether evidence of a defendant's other crimes, wrongs, or acts is admissible we apply a four-part test. *United States v. Lennartz*, 948 F.2d 363, 366 (7th Cir.1991). That evidence may be admitted where:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Id.* (quoting *United States v. Whalen,* 940 F.2d 1027, 1032 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 403, 116 L.Ed.2d 352 (1991)). *See also United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984).

The evidence of the marijuana conspiracy clearly satisfies the first element of the test. *See Chaimson,* 760 F.2d at 805 (where specific intent is an element of the crime charged, evidence of other acts may be introduced to establish that intent); *United States v. Liefer,* 778 F.2d 1236, 1243 (7th Cir.1985). The third element of the four-part test is also satisfied. The appellants argue that the second element of the test is not satisfied because the marijuana conspiracy began long before the cocaine distribution conspiracy. They also contend that the two conspiracies' operations differed significantly, and that the two conspiracies had different members. They note that the marijuana conspiracy, unlike the cocaine conspiracy, imported some of the narcotics directly from Colombia. Moreover, they insist that the marijuana conspiracy also included several conspirators who were not involved in the cocaine conspiracy.

Contrary to appellants' contentions, we conclude that the second element of the test is satisfied. The marijuana conspiracy was, in fact, quite similar to the cocaine distribution conspiracy. Paul was the leader of both conspiracies and was assisted throughout by Daniel, who played a major role in distribution in the St. Louis area. The conspiracies both distributed illegal narcotics purchased from sources in Florida and both principally utilized Yager and Yackey as "runners." Although the marijuana conspiracy began long before the cocaine distribution conspiracy, the later conspiracy commenced shortly after the marijuana conspiracy was terminated. *See Liefer,* 778 F.2d at 1252 (finding that evidence of a prior conspiracy was not too remote because it ended shortly before a second conspiracy began). The evidence demonstrated that Paul used the organizational framework developed during the marijuana conspiracy to initiate the cocaine conspiracy.

The fourth element of the four-part test is whether "the probative value of the evidence is ... substantially outweighed by the danger of unfair prejudice." *Lennartz,* 948 F.2d at 366; *Jackson v. United States,* 886 F.2d 838, 847 (7th Cir.1989). The probative value of the evidence of the marijuana distribution conspiracy to show intent, motive, and opportunity is strong because it demonstrated that the Paul and Daniel utilized essentially the same organization to distribute cocaine. The unfairly prejudicial impact of the evidence, although not negligible, was limited because the district court instructed the jury that it could not consider the evidence of the marijuana conspiracy as evidence of the appellant's guilt.

Our decision in *Liefer* is instructive here. 778 F.2d at 1252. In *Liefer,* we upheld the admission of evidence of the defendant's membership in an uncharged drug conspiracy. In that case, one conspirator testified that the charged conspiracy grew out of his contacts from a prior conspiracy. The defendant was a member of both conspiracies. *Id.* We upheld the admission of the co-conspirator's testimony "as background on how the conspiracy developed, and to show the [defendant]'s intent and plan to resume operating as a middleman for [the testifying conspirator]." *Id.* Accordingly, we hold that the district court did not abuse its discretion in admitting evidence that the appellants had conspired to distribute marijuana in the 1970's.

Even if we were convinced that the evidence did not meet the requirements for admissibility under Rule 404(b), we would be required to affirm the appellants' convictions because the evidence of their guilt was overwhelming, and thus, any error was harmless. *See United States v. Williams,* 951 F.2d 853, 858 (7th Cir.1992).

Paul raises an additional Rule 404(b) challenge to his convictions. He argues that the district court erred in allowing the government to introduce evidence of his prior imprisonment as a result of his Florida conviction. At trial, Yackey testified that Paul told him, in 1980 or 1981, that he wanted to begin distributing co-

caine because he needed to "support his family and keep things going" while he was in prison. The government introduced evidence of Paul's Florida imprisonment to explain his motive, intent, opportunity and plan, in setting up the cocaine distribution operation. The jury was not informed of the criminal conduct underlying the imprisonment.

Paul argues that this evidence does not meet the four-part test for the admissibility of Rule 404(b) evidence. Daniel and Woods argue that Yackey's testimony also prejudiced them as well. We conclude that the testimony met the four-part test under Rule 404(b). The testimony clearly met the first and third elements of the test. *See Lennartz,* 948 F.2d at 366. The evidence was highly relevant to the conspiracy charge because it explained why Paul began distributing cocaine, thus satisfying the second part of the test. The chance that the evidence would unfairly prejudice Paul was sufficiently reduced because the government did not introduce evidence of the conduct underlying the sentence of imprisonment. Thus, the fourth element of the test was satisfied. *See id.*

This case is unlike *United States v. Falco,* 727 F.2d 659, 663 (7th Cir.1984) where the government properly introduced the defendant's prior theft convictions to show that the defendant knew that goods he possessed were stolen. Here, the jury was aware only that, in 1980 or 1981, Paul had been convicted and would soon after serve a prison sentence. The evidence was introduced only to show why he began the cocaine distribution conspiracy. Paul's prior imprisonment was not introduced to show that he had a propensity for committing drug related offenses.

The appellants contend that the district court abused its discretion in refusing to allow the appellants to cross-examine Yager and Yackey about their past drug use. They also contend that the district court's rulings violated their rights under the confrontation clause. During voir dire examination out of the jury's presence, Yackey and Yager each admitted to extensive past drug use. As to Yager, the district court

prohibited cross-examination about past drug use, finding that the appellants had not shown that "the use of drugs to the extent that [Yager] has testified has affected his truthfulness or his ability to remember or testify truthfully as to that memory." As to Yackey, the district court allowed the appellants to show during cross-examination that he had suffered blackouts and memory loss from the use of alcohol, and that he had used alcohol in combination with cocaine.

■ The district court has broad discretion in limiting the cross-examination of a witness. *United States v. Herrera–Medina,* 853 F.2d 564, 566 (7th Cir.1988); *United States v. Robinson,* 832 F.2d 366, 373 (7th Cir.1987), *cert. denied,* 486 U.S. 1010, 108 S.Ct. 1739, 100 L.Ed.2d 203 (1988). In *United States v. Cameron,* we held that the district court may admit evidence concerning a witness' own past drug use insofar as it relates to his " 'possible inability to recollect and relate.' " 814 F.2d 403, 405 (7th Cir.1987) (quoting *United States v. Banks,* 520 F.2d 627, 631 (7th Cir.1975)); *Jarrett v. United States,* 822 F.2d 1438, 1445 (7th Cir.1987). Therefore, the district court need only allow cross-examination concerning a witness' past drug use if the witness' memory or mental capacity are "legitimately at issue." *Cameron,* 814 F.2d at 405. We also noted, in *Cameron,* that "evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony." *Id.;* FED.R.EVID. 403. The district court may bar cross-examination about a witness' illegal drug use when it is used "for the sole purpose of making a general character attack." *Cameron,* 814 F.2d at 405.

■ The appellants contend that the district court should have allowed them to inquire into past drug use to impeach the character and credibility of Yackey and Yager, and to show that they were more involved in the Robinson organization than they admitted. The appellants, in sum, insist that witnesses who have previously used narcotics are more likely to tell lies.

This is exactly the type of character attack that *Cameron* and *Jarrett* forbid.

 The appellants cannot show that the district court unfairly limited cross-examination. As to Yackey, the appellants' objection that cross-examination was unfairly limited is meritless because the district court allowed the appellants to demonstrate that drug and alcohol use had caused memory loss. As to Yager, the district court did not abuse its discretion in limiting cross-examination because, in voir dire, the appellants did not establish that Yager's drug use had affected his memory of relevant events. The appellants' confrontation clause argument is similarly without merit. *See United States v. Diaz,* 876 F.2d 1344, 1349 (7th Cir.1989); *United States ex rel. Ashford v. Director, Ill. Dept. of Corr.,* 871 F.2d 680, 685 (7th Cir. 1989).

Paul argues that the district court erroneously denied his motion for a mistrial after, he contends, a government witness, Agent Michael Braun, made an unconstitutional comment upon his post-*Miranda* silence. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). A review of the record demonstrates that this argument is without merit.

 After Agent Braun arrested Paul, and read him a *Miranda* warning, Paul made two statements. First, Paul said "[t]he only thing I talked to him [Yackey] about over the phone or in his office the last couple days is about a restaurant I want him to help me with in Manchester." Yackey was present when the arrest took place. Agent Braun responded that the investigation had been going on for several weeks and that Yackey was cooperating. At trial, Agent Braun stated that: "[Paul] dropped his head and said, 'Oh forget it.' "

It is readily apparent from this conversation that Agent Braun did not comment upon Paul's silence in violation of the due process clause. In *Doyle,* the court held that "the use for impeachment purposes of petitioner's silence, at the time of arrest and after *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. at 2245.

After he received a *Miranda* warning, Paul voluntarily waived his constitutional right to remain silent. We hold that the government made no comment upon his silence.

 The district court also properly increased, by four levels, Paul's offense level as an organizer or leader of the conspiracy, pursuant to Sentencing Guideline § 3B1.1(a). *See* United States Sentencing Commission, *Guidelines Manual,* § 3B1.1(a) (1991). We review the district court's factual finding that Paul was an organizer or leader of criminal activity for clear error. *United States v. Rosengard,* 949 F.2d 905, 908 (7th Cir.1991); *United States v. Hintzman,* 937 F.2d 1196, 1199 (7th Cir.1991); *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989). The record evidence was sufficient for the district court to find that Paul was a leader of the cocaine distribution conspiracy. Paul initiated the conspiracy, obtained its source of supply, and retained a leadership role throughout its existence. *United States v. Thompson,* 944 F.2d 1331, 1348–49 (7th Cir.1991) (the defendant located cocaine sources, recruited couriers, and profited significantly from the activities of the conspiracy); *United States v. Cooper,* 942 F.2d 1200, 1209 (7th Cir.1991).

## III.

The other arguments raised by the appellants are without merit.

We AFFIRM the convictions and sentence of Paul Robinson, and the convictions of Daniel Robinson and Dillard Woods.