Ladell HENDERSON, Petitioner–
Appellant,

v.

George E. DeTELLA,* Respondent–
Appellee.

No. 95–1834.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 4, 1996.

Decided Oct. 3, 1996.

Rehearing Denied Dec. 5, 1996.

---

* In his habeas petition, the petitioner has named as respondents George C. Welborn, currently the warden of the maximum security facility at Tamms, Illinois, and James E. Ryan, the Illinois Attorney General. Because the petitioner is presently in custody at the Stateville Correctional Center pursuant to the conviction he challenges in his habeas petition, the proper respondent is George E. DeTella, the warden of that facility. We have made the substitution pursuant to Fed. R.App. P. 43 at the state's suggestion.

Kathryn T. Ditmars (argued), McDermott, Will & Emery, Chicago, IL, for Petitioner-Appellant.

Michael M. Glick (argued), Office of Attorney General, Chicago, IL, for Respondent-Appellee.

Before ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

An Illinois jury convicted Ladell Henderson of murder and attempted murder, for which he was sentenced to respective prison terms of life and thirty years. His petition for a writ of habeas corpus contends that his post-arrest confession of involvement in these crimes was made without a voluntary, knowing, and intelligent waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that the trial court erred in barring him from presenting evidence that the complaining witness used narcotics. The district court denied Henderson's petition. We affirm.[1]

**I.**

In the early morning hours of February 28, 1984, Mona Chavez was at home in Chicago watching television with her uncle, Dennis Leonard. After nodding off to sleep, Chavez was awakened by a pounding on the front door. Leonard answered and was confronted by Henderson and two other men. Leonard was thrown to the floor. Henderson told both Chavez and Leonard that they were going to die. He pulled out a gun and fired two shots into the back of Leonard's head,

---

**1.** After we heard oral arguments in this appeal, the President signed into law what is known as the Anti-terrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214. Among other changes, the statute adds a new provision to 28 U.S.C. § 2254, under which Henderson seeks relief. Section 2254(d) now provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application

of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This court held recently that the provisions of section 2254(d) apply to habeas petitions filed prior to enactment of the new statute. *Lindh v. Murphy*, 96 F.3d 856 (7th Cir.1996) (en banc). We need not decide what effect, if any, these provisions have on our review of Henderson's claims. His petition fails under either the new or the previous versions of the habeas statute.

killing him. Chavez, who was sixteen years old, knew Henderson (age eighteen), from the neighborhood. He had asked her on several occasions to be "his lady." (She testified that she had declined his offer, although defense witnesses said that the two were involved romantically.) Days before the shooting he had broken into her apartment and stolen several items of clothing. Now, as Chavez pleaded with Henderson to spare her life, he told her that if he could not have her, no one would. He grabbed her hair, put a gun to her ear, and shot her three times.

Miraculously, Chavez survived. She regained consciousness hours after the shooting, crawled from the second floor apartment, stumbled down the stairs, and sought help from a downstairs neighbor, who telephoned the police. Chavez told the officer who arrived on the scene that Henderson had shot her.

Henderson was located at a tavern and taken into custody. (The record does not disclose the fate of his two accomplices.) Officer Clifton Underwood testified that he apprised Henderson of his *Miranda* rights both at the scene of his arrest and later at the police station; he also testified that Henderson acknowledged these rights as he was informed of them. Henderson did not appear confused to the officers who observed him. Although cooperative, he declined to make a statement initially, other than to profess ignorance as to the reason for his arrest and to deny having killed anyone. However, according to Underwood, Henderson later had a change of heart and said that he wanted to tell Underwood "what really happened." Underwood testified that he again told Henderson what his rights were, and that Henderson acknowledged them. The two then spoke for twenty to thirty minutes. Subsequently, Assistant State's Attorney Kim Kardas took a statement from Henderson. Kardas knew Henderson from a previous prosecution in juvenile court and later testified that he reminded Henderson of this as he introduced himself. Detective Peter Valesares was present while Kardas interviewed Henderson and confirmed that Kardas and Henderson appeared to know one another. Valesares also testified that he told Henderson before this interview that he was being charged with shooting Chavez and killing Leonard and that a state's attorney would be coming to speak with him.

After speaking with Henderson, Kardas prepared a written statement for him to sign. In substance, the statement indicated that Henderson had taken two men ("Billy Ray" and "Speedy") to Chavez's home for the purpose of executing a contract on her life (she purportedly had "set up" an El Rukn gang member), but did not participate in the shootings. When Henderson began to review the statement, he noted a reference to Kardas being an assistant state's attorney. He purported to be confused by that and said that he had understood Kardas to be his own attorney, not the state's. He then refused to sign the statement. Henderson later testified at a suppression hearing that he had spoken to Kardas thinking that Kardas was a defense attorney, not a prosecutor.

The state subsequently charged Henderson with murder, attempted murder, conspiracy to commit murder, and home invasion. Chavez testified at trial and identified Henderson as the assailant. On cross-examination, the defense inquired into her relationship with one Quintin Jones and asked Chavez whether she had used "speed" in the presence of Henderson and Jones. Chavez acknowledged knowing Jones but denied that she had been involved with him romantically and denied having ever used speed. When the defense later attempted to have Jones testify that he had seen Chavez use drugs on numerous occasions, the trial court sustained the state's objection, noting that "the only reason [you're] doing it is to dirty up the witness." In addition to Chavez's testimony, the state was permitted to offer into evidence the written statement that Kardas prepared based on what Henderson had told him. That statement, of course, placed Henderson at the scene of the shooting. Henderson had moved unsuccessfully in advance of trial to suppress the statement. Having failed in that effort, Henderson's theory of defense was that although he had participated in the home invasion, he had

done nothing more. The jury rejected that theory and convicted Henderson on all charges. The trial judge ordered Henderson to serve a term of natural life in prison for Leonard's murder, thirty years for the attempted murder of Chavez, and seven years for the conspiracy to commit murder. No sentence was imposed for the home invasion.

On appeal, the Illinois appellate court vacated Henderson's conviction on the conspiracy charge, but affirmed his conviction and sentence on the other charges. *People v. Henderson*, 175 Ill.App.3d 483, 124 Ill.Dec. 934, 529 N.E.2d 1051 (1988), *leave to appeal denied*, 125 Ill.2d 570, 130 Ill.Dec. 485, 537 N.E.2d 814 (1989). Among other issues, the court disposed of two that Henderson has pursued in his habeas petition: the admission of his postarrest statement to the authorities and the refusal to permit him to present extrinsic evidence of Chavez's past drug use. Henderson had moved to suppress his statement arguing that for two reasons his decision to waive his *Miranda* rights was not voluntary, knowing, and intelligent. He contended that he had been misled into thinking that Kardas was his own attorney and that, in any event, his limited mental capacity and below-average I.Q. (sixty-four) rendered him unable to make a reasoned decision in this regard. The appellate court did not specifically address the purported confusion as to Kardas' affiliation, although in its recitation of the trial testimony the court noted that Kardas claimed to have expressly identified himself as the state's attorney, not Henderson's. The court did address the question of Henderson's mental capacity to waive his *Miranda* rights:

> In reviewing the totality of circumstances surrounding defendant's statement, we find that a preponderance of the evidence demonstrates that the defendant understood and knowingly waived his constitutional rights. Where as here the record supports a finding that defendant's subpar mentality did not interfere with his ability to comprehend the meaning of a voluntarily made statement or a right to counsel, his statement will not be suppressed.

124 Ill.Dec. at 937, 529 N.E.2d at 1054. The court also found no error in the trial court's decision to exclude Jones from testifying as to Chavez's purported drug use.

> Defendant made no reference or qualification as to when the victim allegedly used drugs or the extent of impairment from the use of any drugs. Thus, we are inclined to agree with the trial court that such evidence would not shed light on the victim's ability to adequately perceive the events as they occurred on the night of the offense. To the contrary, this evidence would simply "dirty up" the witness in the eyes of the jury. Accordingly, we find that the trial court properly excluded any evidence of the victim's alleged drug addiction.

*Id.*

Henderson renewed these arguments in his habeas petition. His first amended petition (which, like the original, was prepared pro se) also asserted a third claim that the jury had been erroneously instructed on attempted murder. After the district court appointed counsel for Henderson, however, that petition was withdrawn and a second amended petition was filed which omitted this claim. The district court rejected the other two claims on their merits. It noted that "[s]tate-court determinations of the validity of *Miranda* waivers are presumed correct under § 2254(d)," and that in this case the finding of a knowing waiver was supported by the testimony of Assistant State's Attorney Kardas. *United States ex rel. Henderson v. Welborn*, No. 91 C 7288, Mem. Op. at 3, 1994 WL 517239 (N.D.Ill. Sept. 13, 1994). The court observed further that Henderson's claim that he was not mentally equipped to waive his rights was "belied by the fact that he attempted to refute the validity of this *Miranda* waiver after *reading* his statement." *Id.* (emphasis in original). Under the totality of the circumstances, then, the court found that Henderson had waived his rights and had voluntarily made the postarrest statement admitted at trial. *Id.* The court also rejected Henderson's claim that the exclusion of testimony concerning Chavez's purported drug use violated the Confrontation Clause of the Sixth Amendment. *Id.* at 2. The court noted that Henderson had been permitted to cross-examine Chavez

on the subject of drug use, and he was not precluded from impeaching Chavez in *any* manner, but only through Jones. *Id.*

## II.

Henderson pursues these same two issues on appeal. His *Miranda* waiver cannot be deemed voluntary, knowing, and intelligent, he insists, in light of evidence that he was led to believe that he was talking to his own attorney rather than the prosecutor when he waived his right to remain silent, and in light of evidence that his intellectual capabilities are limited. He also renews his argument that he was deprived of his Sixth Amendment right to confront Chavez when the court precluded extrinsic testimony concerning her purported drug use. Henderson attempts additionally to raise a third issue: he contends that he was deprived of due process by an instruction on the attempted murder charge that (purportedly) permitted the jury to convict him on that charge without finding that he acted with the specific intent to kill Chavez. This issue was, as we have noted, omitted from the second amended petition prepared by Henderson's counsel and presented to the district court for decision; the first amended pro se petition, which did raise this issue, was withdrawn. As it was not before the district court, the jury instruction issue is beyond our review in this appeal, and we do not address it. *Williams v. Turner,* 5 F.3d 1114, 1116 (7th Cir.1993); *D.S.A. v. Circuit Court Branch 1,* 942 F.2d 1143, 1152 n. 17 (7th Cir.1991), *cert. denied,* 502 U.S. 1104, 112 S.Ct. 1196, 117 L.Ed.2d 436 (1992).

### A. Waiver of *Miranda* Rights

When a *Miranda* waiver is challenged, two distinct questions are presented: whether the waiver was voluntary, knowing, and intelligent as a matter of fact, and whether it was involuntary as a matter of law. *Baskin v. Clark,* 956 F.2d 142, 145 (7th Cir.), *cert. denied sub nom. Baskin v. Farley,* 506 U.S. 835, 113 S.Ct. 109, 121 L.Ed.2d 67 (1992), and *cert. denied sub nom. Farley v. Baskin,* 506 U.S. 904, 113 S.Ct. 296, 121 L.Ed.2d 220 (1992). Whether a petitioner actually waived his *Miranda* rights, and

whether he did so freely, knowingly, and intelligently, are fact-dependent issues that the state courts are best situated to resolve. *Bryan v. Warden, Indiana State Reformatory,* 820 F.2d 217, 219 (7th Cir.), *cert. denied,* 484 U.S. 867, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987); *Perri v. Director, Dep't of Corrections,* 817 F.2d 448, 451 (7th Cir.), *cert. denied,* 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987). Frequently, for example, the state and the petitioner offer conflicting testimony as to whether the petitioner was apprised of and willingly relinquished his rights; assessing the *Miranda* waiver thus demands credibility assessments that typically only the trier of fact can make. *Bryan,* 820 F.2d at 219; *see also Weidner v. Thieret,* 866 F.2d 958, 961 (7th Cir.1989), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 883, 116 L.Ed.2d 786 (1992). The state court's historical findings as to the petitioner's knowledge, understanding, and determination to forgo his *Miranda* rights are, consequently, entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1) (1996), formerly § 2254(d) (*see* n. 1, *supra*). *E.g., Jones v. Page,* 76 F.3d 831, 852 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 363, —— L.Ed.2d —— (1996); *Bryan,* 820 F.2d at 219–20 (collecting cases). Yet:

> Whether a defendant made a voluntary, knowing and intelligent waiver of his *Miranda* rights is distinct from the issue of whether, under the totality of the circumstances, the challenged statement was involuntary. *Bryan,* 820 F.2d at 219. A court may find that a defendant made a valid waiver and yet still hold that a confession was involuntary.

*Baskin,* 956 F.2d at 145. The ultimate question whether a petitioner's statement was involuntary, and thus whether it was properly admitted at trial, is one of law. *Bryan,* 820 F.2d at 219, 220; *see also Baskin,* 956 F.2d at 145. The Supreme Court has explained why:

> Although sometimes framed as an issue of "psychological fact," *Culombe v. Connecticut,* 367 U.S. [568], at 603, 81 S.Ct. [1860], at 1879 [6 L.Ed.2d 1037] [ (1961) ], the dispositive question of the voluntariness of a confession has always had a uniquely legal dimension. It is telling that in con-

fession cases coming from the States, this Court has consistently looked to the Due Process Clause of the Fourteenth Amendment to test admissibility. See, *e.g.*, *Mincey v. Arizona*, 437 U.S. [385], at 402, 98 S.Ct. [2408], at 2418 [57 L.Ed.2d 290] [ (1978) ]. The locus of the right is significant because it reflects the Court's consistently held view that the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne. See, *e.g.*, *Gallegos v. Colorado*, 370 U.S. 49, 51, 82 S.Ct. 1209, 1211, 8 L.Ed.2d 325 (1962) (suggesting that "a compound of two influences" requires that some confessions be condemned); *Culombe v. Connecticut, supra*, 367 U.S., at 605, 81 S.Ct., at 1880 (describing voluntariness as an "amphibian"). This hybrid quality of the voluntariness inquiry, subsuming, as it does, a "complex of values," *Blackburn v. Alabama*, 361 U.S. [199], at 207, 80 S.Ct. [274], at 280 [4 L.Ed.2d 242] [ (1960) ], itself militates against treating the question as one of simple historical fact.

*Miller v. Fenton*, 474 U.S. 104, 115–16, 106 S.Ct. 445, 452–53, 88 L.Ed.2d 405 (1985) (footnote omitted) (emphasis in original). Thus, whether the petitioner's statement was the product of fundamentally fair procedures, untainted by any type of coercion, is a legal question that we review de novo. *Weidner*, 866 F.2d at 961; *Bryan*, 820 F.2d at 219, 220; *see also United States v. Betts*, 16 F.3d 748, 763 n. 10 (7th Cir.1994).

1. Involuntariness

█ We take up the legal question first. As we have explained, Henderson argues that his statement was involuntary as a matter of law because the authorities deceived him into thinking that Kardas was his own counsel. *See, e.g., Leyra v. Denno*, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954) (confession to state-employed psychiatrist deemed involuntary where defendant misled as to psychiatrist's mission and allegiance). The admission of that statement at trial was

therefore assertedly in violation of the Due Process Clause of the Fourteenth Amendment. As a legal assertion, this claim demands plenary review. But the assertion depends on a point of fact as to which the parties disagree: did Kardas identify himself to Henderson as a prosecutor? On that subsidiary factual question, we defer to the state court. *Weidner*, 866 F.2d at 961; *Bryan*, 820 F.2d at 221.

Henderson initially contends that neither the state trial and appellate courts nor the district court have ever addressed this claim. It is true that none of the courts to whom Henderson has made this argument previously has rejected it expressly. Yet, each court did find ultimately that Henderson's waiver was made voluntarily, knowingly, and intelligently (S.R. 35 (trial court), 124 Ill.Dec. at 937, 529 N.E.2d at 1054 (appellate court), Mem. Op. at 3 (district court)), and there is no requirement that a court detail its reasons for rejecting each of the arguments the petitioner has advanced for a contrary finding. *See, e.g., Baskin*, 956 F.2d at 144; *Weidner*, 866 F.2d at 963; *Bryan*, 820 F.2d at 221. Moreover, it seems clear to us is that each of the courts did have in mind Henderson's allegation as to Kardas' identity. For example, the Illinois appellate court, in its factual summary of the case, noted:

> Kardas testified that prior to his questions directed to defendant, he informed defendant that he was an assistant State's Attorney. Kardas read defendant his rights and defendant indicated that he understood. According to Kardas, defendant stated that he knew what an assistant State's Attorney was and also knew that Kardas was not his lawyer.

*People v. Henderson*, 124 Ill.Dec. at 935, 529 N.E.2d at 1052. That court plainly understood why this testimony was relevant. Although the court did not go on to find expressly that Henderson was not misled as to whom Kardas represented, we believe that finding was implicit in its conclusion that "the defendant understood and knowingly waived his constitutional rights" and that his limited mental abilities "did not interfere with his ability to comprehend the meaning of a voluntarily made statement or a right to coun-

sel...." *Id.* 124 Ill.Dec. at 937, 529 N.E.2d at 1054.[2] Likewise, when the district court remarked that the state courts' finding of a voluntary waiver "is supported by the statements of the Assistant State's Attorney," we understand it to have meant that Kardas' testimony lent adequate support to the notion that Henderson was properly apprised as to whom Kardas owed his allegiance.

We treat the state courts' implicit determination that Henderson knew who Kardas was as presumptively correct (*Bryan,* 820 F.2d at 221), and having thoroughly reviewed the record, we have found nothing that would permit us to set aside that determination. Kardas and Detective Valesares asserted that Kardas was introduced to Henderson as an assistant state's attorney and that the two knew one another already. The officers who had observed Henderson and spoken with him that day indicated that he seemed to comprehend what was happening. The state's forensic psychiatrist testified that in his interview of Henderson, Henderson had manifested an appreciation of the difference between an assistant state's attorney and a defense attorney. *See United States v. Frank,* 956 F.2d 872, 878 (9th Cir.), *cert. denied,* 506 U.S. 932, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992). By the state's account, not until Henderson began to read the written statement Kardas had prepared did he show signs of confusion. Whether that confusion was genuine, and whether Henderson had been misled as to whom Kardas represented, turned entirely on the credibility of the witnesses who testified before the state trial court. The state court plainly credited the state's witnesses, and we have no basis to disturb that credibility determination. *Sprosty v. Buchler,* 79 F.3d 635, 645 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 150, —— L.Ed.2d —— (1996); *Armstrong v. Young,* 34 F.3d 421, 427 (7th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1369, 131 L.Ed.2d 224 (1995).

Wrested of its factual premise—that Henderson was deceived as to whom Kardas represented—the legal claim of involuntari-

ness necessarily fails. Looking to the totality of the circumstances, we see no hint of coercion or otherwise unfair behavior on the part of the state that would justify a determination that Henderson's statement to Kardas was involuntary and that the admission of the statement at trial was necessarily erroneous. This leaves Henderson with the claim that he did not, as a matter of fact, waive his *Miranda* rights. That claim we take up next.

### 2. Waiver as a matter of fact

█ Based on the evidence of record, we also find no reason to disturb the state courts' determination that Henderson made a voluntary, knowing, and intelligent decision to waive his *Miranda* rights notwithstanding the apparent limits of his intellect. Again, this was a factual determination that we treat as presumptively correct. *See Jones,* 76 F.3d at 852; *Perri,* 817 F.2d at 451–52; *Bryan,* 820 F.2d at 219. Henderson's purportedly low I.Q. and limited reading and comprehension capabilities obviously call for caution in assessing the uncounseled waiver of his constitutional rights. See *Sims v. Georgia,* 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967) (per curiam); *Miller v. Dugger,* 838 F.2d 1530, 1539 (11th Cir.), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988); *Moore v. Ballone,* 658 F.2d 218, 229–30 (4th Cir.1981); *Cooper v. Griffin,* 455 F.2d 1142, 1145–46 (5th Cir.1972). Yet, as both the Illinois appellate court and the district court recognized, such limitations, at least of the degree presented here, do not preclude a finding that Henderson could and in fact did make a reasoned and independent decision to speak with the authorities. See *Toste v. Lopes,* 861 F.2d 782, 783 (2d Cir. 1988) (per curiam), *cert. denied sub nom. Toste v. Meachum,* 490 U.S. 1112, 109 S.Ct. 3170, 104 L.Ed.2d 1032 (1989); *Winfrey v. Wyrick,* 836 F.2d 406, 411 (8th Cir.1987), *cert. denied sub nom. Winfrey v. Armontrout,* 488 U.S. 833, 109 S.Ct. 91, 102 L.Ed.2d 67 (1988); *United States v. Glover,* 596 F.2d 857, 866 (9th Cir.), *cert. denied,* 444 U.S. 860,

---

**2.** Neither party, certainly, suggests that this is a case in which the court might have accepted the factual premise of the petitioner's argument, yet still rejected the claim that a constitutional viola-

tion occurred. *Cf. Weidner,* 866 F.2d at 962–64 (possibility that state court might have accepted some of petitioner's factual assertions required clarification of court's findings).

100 S.Ct. 124, 62 L.Ed.2d 81 (1979), and *cert. denied sub nom. Morrow v. United States,* 444 U.S. 857, 100 S.Ct. 117, 62 L.Ed.2d 76 (1979); *see also United States v. Bad Hand,* 926 F.Supp. 891, 899–900 (D.S.D.1996) (collecting cases). Here, in addition to the testimony of a psychologist who documented Henderson's below-average I.Q. and limited reading abilities, the state court had other evidence suggesting that Henderson was able to comprehend what his rights were and to waive them knowingly and voluntarily. The state's forensic psychiatrist had deemed him fit for trial, finding, among other things, that Henderson was able to appreciate the nature of the charges against him. The police officers who observed Henderson on the day of his arrest described him as cooperative and understanding of what was transpiring. According to those officers, Henderson had acknowledged his rights on each of the several occasions that they were explained to him. Henderson himself testified at the suppression hearing that he had been read his rights, that he had heard them many times before, and that he had told the police that he understood them. Indeed, he declined to make a statement on the first two of these occasions, and later began to speak, according to Officer Underwood, of his own accord and at his own initiative. He then gave a statement to Kardas, according to the state's witnesses, knowing full well who Kardas was. This was not, finally, Henderson's first encounter with the authorities. At age eighteen, Henderson already had a significant criminal record and in fact had, by the state's account, already encountered Kardas in the context of a juvenile prosecution. Under all of these circumstances, we must accept the state courts' determination that Henderson was able to make a valid decision to forego his *Miranda* rights and speak with the police and with Kardas and that he in fact did so.

## B. Impeachment of Chavez

■ Chavez's testimony was crucial to the state's case against Henderson. The use of narcotics can, obviously, affect the ability of a witness to perceive, to recall, and to recount the events she has observed. Whether Chavez may have been under the influence of narcotics at the time of the offense (or at some other pertinent time) was thus an appropriate subject of inquiry and impeachment. *United States v. Cameron,* 814 F.2d 403, 405 (7th Cir.1987).

■ But we agree that Henderson was not deprived of his right to confront the witnesses against him when the trial court barred the testimony of Quintin Jones.[3] Had the proffer of Jones' testimony established that Chavez was using narcotics within the time frame of the events to which she testified, it might have been improper and prejudicial to Henderson to exclude the testimony. Instead, however, Jones was held up as a witness who would testify simply that he had known Chavez to use drugs on many occasions; we do not know when those occasions were in reference to the murder of Leonard and the attempted murder of Chavez. It is thus not at all clear that the testimony was probative of Chavez's ability to recognize and identify the individual who committed the offense. *See United States v. Robinson,* 956 F.2d 1388, 1398 (7th Cir.), *cert. denied,* 506 U.S. 1020, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992) (testimony as to witness' drug use properly excluded where voir dire did not establish that it affected the witness' memory of relevant events). Absent a connection to Chavez's cognitive abilities, Jones' testimony would have served only to impeach her character, a purpose we have repeatedly deemed improper. *See United States v. Neely,* 980 F.2d 1074, 1081 (7th Cir.1992); *Robinson,* 956 F.2d at 1397–98; *Cameron,* 814 F.2d at 406. Under these circumstances, we see no error, and certainly none rising to the level of a constitutional deprivation, in the decision to bar Jones from testifying on this topic. *Robinson,* 956 F.2d at 1398; *Cameron,* 814 F.2d at 406.

3. The district court suggested that despite the fact that Jones was not permitted to testify, Henderson himself could have taken the stand to impeach Chavez on the subject of her alleged drug use. Assuming that Henderson could have given such testimony as a factual matter, we agree with Henderson that this is irrelevant to the propriety of the trial court's decision to exclude Jones' testimony on this subject. Henderson, of course, enjoyed a Fifth Amendment right not to take the stand, which he exercised.

### III.

The record establishes no error in the state courts' conclusion that Henderson voluntarily, knowingly, and intelligently waived his *Miranda* rights and that the testimony of Quintin Jones concerning Mona Chavez's purported drug use was properly excluded. The district court's decision to deny Henderson's petition for a writ of habeas corpus was therefore correct.

AFFIRMED.