**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with

Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued July 12, 2011
Decided August 24, 2011

**Before**

WILLIAM J. BAUER, *Circuit Judge*

RICHARD D. CUDAHY, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 10-2516

| | |
|---|---|
| MATTHEW ZACHARY, | Appeal from the United States District |
| *Petitioner-Appellant*, | Court for the Southern District of |
| | Indiana, Indianapolis Division. |
| *v.* | |
| | No. 1:09-cv-723-LJM-TAB |
| ALAN FINNAN, | |
| *Respondent-Appellee*. | Larry J. McKinney, |
| | *Judge*. |

**O R D E R**

After a night of drinking, Matthew Zachary stabbed and killed his friend. Within a
few hours, Zachary gave a statement to the police about the stabbing; that statement was
introduced as evidence when he was tried and convicted of murder. In this appeal from the
district court's denial of his petition for a writ of habeas corpus, Zachary argues that his
statement should have been suppressed because he was too drunk to voluntarily,
knowingly, and intelligently waive his right against self-incrimination. Although Zachary's
blood-alcohol concentration reveals that he was extraordinarily intoxicated when he spoke
to the police, the record does not support a conclusion that the Indiana courts decided the
issue unreasonably, as would be necessary to grant Zachary's petition. We affirm.

Zachary and his friend Jay Harmon drank heavily one night in 2002, continuing into the early morning hours. They started drinking at a friend's house and then went to a tavern before returning after 3:30 a.m. to the Anderson, Indiana, home that Zachary shared with his mother, Sandra Scroggins. She was asleep when the men entered the home but awoke upon hearing their voices in the kitchen. She went to the kitchen and Zachary left to go to the bathroom, at which point Harmon grabbed Scroggins around the neck in an apparent drunken embrace. Scroggins told Harmon that he was choking her and tried to get away; they fell, and Harmon landed on top of her. Zachary returned to the kitchen and saw Harmon on top of his mother. The men began arguing, and Zachary ultimately stabbed Harmon in the chest with a kitchen knife. Harmon died, despite a call to 911 and Zachary's attempt to administer CPR. When police officers arrived, Zachary told them that he thought Harmon was attacking his mother, and that he had stabbed Harmon after trying unsuccessfully to pull Harmon off of her.

The police took Zachary to the police station, where he received his *Miranda* warnings from detective Gary Copeland, signed a waiver of his rights at 6:09 a.m., and then gave a videotaped statement to Copeland in which he offered his version of the events that led him to stab Harmon. (In Zachary's telling, he stabbed Harmon when Harmon was on top of his mother on the kitchen floor. Scroggins testified at trial that she was in the living room when the stabbing occurred.) Copeland noticed that Zachary appeared to be intoxicated. At 8:05 a.m.—about two hours after he waived his rights—Zachary's blood-alcohol concentration was determined to be 0.29 percent. (We note for the sake of comparison that under Indiana law, a person with a blood-alcohol concentration of 0.08 percent can be found guilty of driving while intoxicated. *See* IND. CODE § 9-30-5-1.)

Zachary was charged with murder. He moved to suppress the entire videotaped statement he gave to Copeland, arguing that he did not appreciate his rights because he was intoxicated and that his statement thus could not be regarded as voluntary. The trial court held a suppression hearing, where the videotaped statement and a transcribed version of it were submitted for the court's consideration. The trial court denied the motion, and the videotape of the statement was admitted as evidence and played during Zachary's trial. A jury found Zachary guilty, and he was sentenced to 60 years in prison.

On appeal Zachary again argued that his waiver of his rights and subsequent statement were not made voluntarily because he was intoxicated. The Indiana Court of Appeals denied his appeal. The appellate court acknowledged that Zachary was drunk when he gave his statement, and that Copeland had testified at the suppression hearing that Zachary smelled of alcohol, had bloodshot eyes, exhibited impaired speech, and appeared to be depressed and somewhat disoriented. But the appellate court also noted that Copeland said he believed Zachary understood "exactly what he was there for and

understood my questions and his thinking was rather clear." The appellate court concluded that the trial court had not erred by admitting Zachary's statement:

> The transcript to Zachary's statement shows that he was aware of what was happening, responsive to Detective Copeland's questions, and spoke coherently. It was reasonable for the trial court to conclude that Zachary was not so intoxicated that he was unconscious of what he was saying. Further, there is no evidence that the police induced Zachary's statements through violence, threats, or other improper influence.

The Indiana Supreme Court denied transfer.

After unsuccessful post-conviction review of other claims in the Indiana courts, Zachary petitioned in the district court for a writ of habeas corpus, arguing again that his extreme intoxication prevented him from voluntarily, knowingly, and intelligently waiving his rights before giving his statement, and that his statement therefore should not have been admitted. The district court denied his petition. We granted Zachary a certificate of appealability as to the validity of his waiver.

Zachary argues that the Indiana Court of Appeals' decision that he validly waived his rights was unreasonable. *See* 28 U.S.C. § 2254(d). A decision is unreasonable and warrants a writ of habeas corpus only if it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011); *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011). Although we have not been consistent in characterizing the issue of a waiver's validity, *compare Henderson v. DeTella*, 97 F.3d 942, 946 (7th Cir. 1996) (question of fact), *with Collins v. Gaetz*, 612 F.3d 574, 586 n.5 (7th Cir. 2010) (mixed question of law and fact), we may set aside the state court's decision only if an unreasonable error has been committed. *See Collins*, 612 F.3d at 586 n.5; *Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003).

Before a criminal suspect in custody may be interrogated, he must be warned, among other things, that he has a right to remain silent and that anything he says can be used against him in court. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). No evidence obtained from questioning may be used against him unless the prosecution shows that he received a warning and waived his rights. *See id*. at 479. The suspect's waiver must be voluntary, knowing, and intelligent—that is, it must be the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and it must be made with a full awareness of the nature of the rights that he is abandoning and the consequences of his decision to abandon them. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010); *Moran v.*

*Burbine*, 475 U.S. 412, 421 (1986); *Miranda*, 384 U.S. at 444. A court may conclude that a waiver was legitimate only when the totality of the circumstances surrounding the interrogation demonstrate both "an uncoerced choice and the requisite level of comprehension." *Burbine*, 475 U.S. at 421.

Zachary contends that his waiver was not knowing and intelligent because he was so drunk that he did not comprehend his rights. In support, he cites his apparent inability to respond to Copeland's questions, as reflected in the *trial transcript's*[*] repeated notation of "(NO VERBAL RESPONSE)":

Q      Okay. You understood what your rights were?
A      (NO VERBAL RESPONSE)
Q      Okay. To be on the safe side, I'm going to advise you one more time of your rights, okay? So that I know that you understand what they are.
A      Okay.
Q      After each one of these just say yes or no. Okay? That way I will know that you do understand. You have the right to remain silent. Do you understand that?
A      (NO VERBAL RESPONSE)
Q      Is that a yes?
A      Yeah.
Q      Okay. If you anything [sic] it can be used in court. Do you understand that?
A      (NO VERBAL RESPONSE)
Q      Is that a yes?
A      Yes.
Q      You have the right to have an attorney present. Do you understand that?
A      Yes.
Q      And if you cannot afford a lawyer, one will be appointed before questioning. You understand that?
A      Yes.
Q      If you decide to answer questions now without a lawyer, you can stop answering any time you want. Do you understand that?
A      (NO VERBAL RESPONSE)
Q      Okay. If you still want to answer a few questions for me, I need your

---

[*] The trial transcript refers to the multivolume transcript of the trial proceedings. As we will explain, it is distinct from the transcribed videotaped statement mentioned above.

signature right here, anywhere on that line right there.

A     But I'm not admitting nothing. This is not an admission of guilt, right?

Q     No, absolutely not. No, you're that's not . . . you're not admitting any guilt here. All you're saying is you understand what those rights are.

A     Okay, I understand that.

Q     And you're agreeing to answer a few questions because, you know, we need to know what happened, obviously, right?

The instances of "(NO VERBAL RESPONSE)" tend to support the view that Zachary was unaware of what was happening or being said, and thus did not understand his rights.

But the *transcribed videotaped statement*, which Zachary does not cite, presents a different scenario, because it explains that he nodded—"(Witness nods.)"—at each point where the trial transcript says only that he gave no verbal response. By nodding, Zachary signaled that he understood the rights Copeland was explaining to him. *See United States v. Browning*, 436 F.3d 780, 780 (7th Cir. 2006) (dismissing "frivolous" argument that suspect cannot indicate comprehension of *Miranda* rights by nodding head); *United States v. Smith*, 218 F.3d 777, 780-81 (7th Cir. 2000); *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996).

The fuller description of Zachary's responses reflected in the transcribed videotaped statement undermines his argument that his waiver was not knowing and intelligent. Although he contends that he was incoherent, unresponsive to questions, unable to process information, and unaware of the significance of the waiver form when he signed it, the record belies those claims. As the transcribed statement shows, Zachary responded affirmatively when Copeland asked if he understood his rights, and he continued to respond cogently throughout Copeland's questioning. Zachary's question when he signed the waiver—"This is not an admission of guilt, right?"—reflected a proper understanding of the form's significance. Moreover, when he was allowed later to speak with Scroggins—a meeting that was part of his videotaped statement—he told her, "Mom, don't answer nothing, all right," and "Mom, don't answer no questions without a lawyer. It's unconstitutional." Those directives suggest an awareness and understanding of the rights protected by *Miranda* warnings.

Zachary also makes two unrelated and off-target arguments that he lacked the understanding of his rights necessary to make his waiver knowing and intelligent. He argues, first, that his "fantastic" and "self-contradictory" description of the stabbing reflected his mindset at a moment when he was incoherent and lacked awareness. But the question here is not whether Zachary's statement was accurate and internally consistent, but whether he understood his rights. Based on this record, the Indiana courts reasonably concluded that he did.

Additionally, Zachary attacks Copeland's credibility at the suppression hearing, where he testified that Zachary was thinking clearly and understood his questions; the Indiana Court of Appeals cited that testimony in concluding that Zachary's waiver was knowing and intelligent. Zachary contends that Copeland was evasive and more concerned with securing the statement's admission than accurately describing Zachary's mental state. But—barring an unreasonable decision—Copeland's credibility was a matter for the trial court to assess, *see Ruvalcaba v. Chandler*, 416 F.3d 555, 560 (7th Cir. 2005); *Hinton v. Uchtman*, 395 F.3d 810, 819 (7th Cir. 2005), and on this record the trial court could reasonably have credited him and admitted the statement.

Apart from arguing that his waiver was not knowing and intelligent, Zachary also contends that his waiver was involuntary because Copeland coerced him into talking, despite knowing that he was drunk. Zachary argues that Copeland took advantage of him and coaxed him into making a statement while intoxicated by waking him up for questioning, and by prodding him to answer questions ("And you're agreeing to answer a few questions because, you know, we need to know what happened, obviously, right?") immediately after reassuring him that the waiver was not an admission of guilt.

Although "a lesser quantum of coercion" may be sufficient to raise doubts about the voluntariness of a suspect's waiver when an interrogating officer should know that a suspect was under the influence of alcohol, *United States v. Carson*, 582 F.3d 827, 833-34 (7th Cir. 2009); *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir. 1991), Copeland's words and actions do not rise to the level of coercion, which occurs when police use deliberate means to "break [a suspect's] will," *see Colorado v. Spring*, 479 U.S. 564, 573-74 (1987). Nothing of that nature occurred here. Zachary's "capacity for self-determination" may have diminished because he was drunk, but police conduct—let alone coercive police conduct—did not cause his intoxication. *Id.*; *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers."). Making sure a suspect is awake and alert—and bringing him coffee, as Copeland did for Zachary—hardly seems like conduct that would override a suspect's will. Similarly, Copeland was not coercive when he said—accurately—that signing the waiver form was not an admission of guilt. *See Spring*, 479 U.S. at 573-74. Nor was Zachary's waiver tainted by Copeland's efforts to get him talking, and to continue talking. Even if what Copeland did could be described as a ploy to trick or lull Zachary into talking, his actions would not affect the admissibility of Zachary's statement because he did not compel or force Zachary to talk. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990); *United States v. Charles*, 476 F.3d 492, 497 (7th Cir. 2007).

At its heart, Zachary's claim seems to be that he could not have validly waived his rights because his blood-alcohol concentration was so high. But there is no per se rule that a

suspect who is intoxicated—or whose blood-alcohol concentration is above some threshold level—is incapable of waiving his rights. *See, e.g., United States v. Gaddy*, 532 F.3d 783, 788-89 (8th Cir. 2008); *United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008); *United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir. 1995); *United States v. Andrews*, 22 F.3d 1328, 1340-41 (5th Cir. 1994); *United States v. Lincoln*, 992 F.2d 356, 359 (D.C. Cir. 1993); *United States v. Smith*, 608 F.2d 1011, 1012-13 (4th Cir. 1979); *see also Matylinsky v. Budge*, 577 F.3d 1083, 1095-96 (9th Cir. 2009) (noting that Supreme Court has never clearly established as federal law that intoxication can negatively affect waiver). The validity of waiver is determined by the totality of the circumstances, *see Burbine*, 475 U.S. at 421, and the decision of the Indiana Court of Appeals was reasonable given the circumstances of Zachary's case.

Accordingly, we AFFIRM the judgment of the district court.